EVA MAY RIDGEWAY *vs.* J. ROBERT CELS.

Middlesex.   December 10, 1965. — February 10, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & SPIEGEL, JJ.

*Parent and Child.   Minor.*

In a proceeding in a Probate Court of Massachusetts for the guardianship and custody of two children by their maternal grandmother, a resident here, commenced more than a year and one half after the children's father had obtained a decree of divorce in Ohio, where he resided, granting custody of the children to their mother and visitation rights to him and shortly after the mother's death in Massachusetts, evidence did not warrant findings by the trial judge that the father, whose attempts to be with the children had been frustrated and whose withholding of certain support payments had been on advice of counsel and who contested the grandmother's petition, had "evidenced no interest" in the children since they and their mother had failed to return to Ohio from Massachusetts and that he had "shown no natural affection" for the children; and a long range consideration of the welfare of the children, who were approaching adolescence, required a conclusion that their father, who had remarried, should have custody of them, and a decree in the proceeding appointing the grandmother guardian with custody was reversed and the petition ordered to be dismissed.

Ridgeway v. Cels.

PETITION filed in the Probate Court for the county of Middlesex on August 20, 1964.

The case was heard by *Leggat*, J.

*Harold Katz* for J. Robert Cels.

*Donald L. Conn* (*Ruth I. Abrams* with him) for Eva May Ridgeway.

WHITTEMORE, J.   J. Robert Cels of Cleveland, Ohio, has appealed from the decree of the Probate Court for Middlesex County, dated November 10, 1964, appointing as guardian, with custody, of his two minor children, Linda May born March 7, 1957, and Carol Ann born July 23, 1958, their maternal grandmother, Eva May Ridgeway, of Lexington, Massachusetts. There is a report of material facts. The evidence is before us.

There was evidence as follows: Cels and Mrs. Ridgeway's daughter Ruth were married on December 31, 1955, and thereafter lived in Cleveland until 1960. In that year the husband and wife and the two children were in Massachusetts together for about two weeks at Mrs. Ridgeway's home; Ruth had an operation; Cels returned to Cleveland expecting his wife to return shortly. Ruth, however, did not return, and started a divorce proceeding in Ohio against Cels which was dismissed in 1961 after a full hearing. Cels wrote a number of letters to his wife, but received no reply. In October, 1960, he came to Boston attempting reconciliation and seeing the children for a short time. Subsequently a marriage counsellor met on a number of occasions with Ruth. Reconciliation failed. On July 18, 1962, the husband and wife entered into a separation agreement under which the wife was to have custody of the children subject to the husband's right to make reasonable visits and to take the children with him at reasonable times and for summer vacation visits of stated duration. The husband was to pay $62.50 a month for the support of each child.

On January 4, 1963, an Ohio court granted Cels a divorce for the wife's "gross neglect of duty." The decree incorporated the separation agreement.

From sometime in 1960 until the signing of the separation agreement Cels made regular voluntary monthly payments for the support of his wife and the children. Thereafter until the summer of 1963, except for a two months' period in 1962 or 1963, he made payments under the agreement and the decree. Cels held up the payments for the two months after talking with his counsel "awaiting some kind of response from Boston." Those payments were made up after a short time. After July, 1963, except for a payment to the Malden Welfare Department in February, 1964, of $397.69 for aid through January 31, 1964, Cels made no payments.

On June 30, 1962, Cels wrote his wife that he was going to send a registered nurse to Massachusetts to take the children back to Ohio. The wife replied that she would not allow the children to leave her but that he was free to visit them at any time. On May 31, 1963, Ruth's attorney wrote Cels that she was "perfectly willing to allow you to see the children here in Massachusetts, provided that you give adequate notice as to when you would be coming." In June, 1963, Cels wrote that he would call for the children at Mrs. Ridgeway's house at midday on July 4 and take them with him for a few days to get acquainted with them. He had a week's vacation.[1] On arriving in Boston Cels went to Mrs. Ridgeway's house. Mrs. Ridgeway told him she did not know where the children were and that he should get in touch with Ruth's attorney. Cels called the attorney's office and was told the attorney was away for the holiday. The following day he obtained Ruth's address from the Third District Court of Eastern Middlesex.[2] At the two family house where Ruth lived he learned from the woman in the upstairs apartment that Mrs. Cels would usually be with her mother. Cels drove back to Mrs. Ridge-

---

[1] His attorney, writing to the Malden Welfare Department on July 6, 1964, stated that Cels had had reservations on Cape Cod for the week's visit.

[2] There had at some time been a proceeding against Cels, under the Uniform Reciprocal Enforcement Act filed through that court, which had been dismissed because of the divorce settlement in Ohio.

way's house, and thereafter, having been told again that she did not know where the children were, he returned to Cleveland. Cels then talked to his attorney and thereafter withheld the payments for the support of the children.

Ruth applied to the Malden Welfare Department for aid on December 3, 1963. The department notified Cels on December 4, and on December 5 Cel's attorney communicated with the department. Correspondence followed. The payment of $397.69 for "total aid given Mrs. Cels through January 31, 1964," was accompanied by a letter tending to indicate that Cels was following his attorney's advice in withholding payments, there being "no alternative."[3]

Correspondence between the welfare department and Cels and his attorney continued in the next several months. A letter from the attorney of July 6, 1964, supplied, as had been requested, copies of records as to the divorce and visitation rights, and asserted in effect that an Ohio court had upheld Cels's refusal to pay unless he was allowed to see the children.[4]

---

[3] The letter stated: "At the time of their divorce, both Mr. & Mrs. Cels signed a Separation Agreement whereby Mr. Cels would have certain visitation rights with his children. He has tried to see his children on several occasions, pursuant to that agreement, but Mrs. Cels has refused, and continues to refuse, to permit him to see his children. It has been some three years since the children have last seen their father and since they are of a tender age, I'm sure they have forgotten what he looks like by this time. It doesn't take a psychologist to know that this is a most unhealthy situation. Mr. Cels is willing to support his children — if he can see them. Mrs. Cels is depriving those children of proper support by her attitude. Mr. Cels has no alternative other than to withhold support payments until Mrs. Cels fulfills her part of the bargain. I have asked the Common Pleas Court here to rule on the question. My request was made on November 25th but to date the Court has set no trial date. I shall let you know of the outcome."

[4] The letter, after reciting the details of the July 4, 1963, attempt to visit, continued, "His letters to Mrs. Cels inquiring about the children have received no reply. These letters were written more than a year ago. So you see, Mr. Cels has no way of knowing whether his children are dead or alive, whether he is being asked to support children who are, in fact, not even in existence. At the court hearing earlier this year, the judge was of the opinion that he would not demand that Mr. Cels uphold his part of the agreement when Mrs. Cels had refused to uphold hers. Mrs. Cels current pronouncement that, 'Mr. Cels can see the children anytime he wants to,' has been heard by Mr. Cels many times over the past three years. The children though, *have not been permitted to see him*, nor he permitted to see them. Therefore Mr. Cels continues to refuse to pay support for someone of whom he has no knowledge and whom he is not sure even exists, contrary to all of his rights, both legal and moral."

The welfare department wrote on July 29, 1964, in strong terms appealing to Cels's conscience and sense of moral obligation and stating that Mrs. Cels "is a very ill woman." Cels replied under date of August 8, 1964, expressing the view that the separation agreement had been deliberately violated in July of 1963.[5]

On the evening of August 10, 1964, Cels received a telegram from Mrs. Ridgeway dated August 9, 1964, notifying him of Ruth's death and that the funeral would be on August 11. Cels wrote Mrs. Ridgeway on August 11 that he was sorry to hear of Ruth's death, that unfortunately he could not arrange his affairs in time to attend the funeral and "[n]aturally I want to bring my children back to Cleveland and my present plans are to pick them up at your home at 29 Locust Avenue on Saturday afternoon of August 22. Please let me know if these arrangements are satisfactory with you. I enclose a self addressed envelope for your convenience." Cels also telephoned Mrs. Ridgeway. She told him he could not come Saturday as she had business to attend to. Mrs. Ridgeway then went to the Probate Court and was appointed temporary guardian of the children, and on August 20, 1964, telegraphed Cels that she had been granted temporary custody and suggesting that he "not come for children."

Cels is about forty-one years of age, an industrial or research chemist employed by Union Carbide, earning $1,060 a month. On September 5, 1964, he married a widow and

---

[5] The letter continued: "To have deprived the children from seeing their father who loves them, and who had driven over 650 miles especially to see them, was a terrible moral crime against both the children and their father. Since I am a stranger to Boston, I do not know anyone there who can help me to keep in touch with my children. I am naturally sorry to hear that Mrs. Cels is a very ill woman but she is the one who took it upon herself to break up the marriage in spite of all my pleadings with her to consider the future happiness of the innocent children. I want to know if the children are happy and well cared for and would be glad to make arrangements to have them with me for a while here in Cleveland if their mother's illness prevents her from being with them. They would be well cared for and could return when Mrs. Cels is once more able to care for them. I know that my attorney, Mr. Sutula, has discussed these facts with you by telephone about eight months ago. It is regrettable that, during this time, you have apparently not felt it necessary to appeal to the consciences of Mrs. Cels and her mother for the sake of my children who have done nothing to deserve being deprived of the companionship of their father."

they now live in a house with a large living room, kitchen, family room and three bedrooms. Mrs. Cels's two younger children, two girls, respectively ten and fifteen years of age, live with them.

Cels's children are now living with Mrs. Ridgeway in a six room house in Lexington, with Mrs. Ridgeway's other daughter Eleanor and Eleanor's son nine years of age at the time of the hearing. The grandson's father visits at the house but never lived there. The children are happy and well adjusted. Mrs. Ridgeway was sixty-eight years of age at the time of the hearing. Her only income is a monthly social security check of $76.80. Eleanor's income is $130 a week as secretary and she and Mrs. Ridgeway pool their resources to maintain the home. The house is subject to a $4,000 mortgage.

The judge's findings included these: "On August 9, 1964, the mother died of cancer an illness of which she had been afflicted for a period of three years. During her periods of hospitalization and on weekends from 1960 to the date of her death the said minor children were cared for at the home of their maternal grandmother . . . . From October of 1960 to the date of the mother's death, the father came to Boston only once to see the . . . children. He did not come . . . after the death of the mother. . . . In July of 1963 the father stopped payment for the support of said minor children. On December 3, 1963 the mother and . . . children went on Aid to Dependent Children with the City of Malden Welfare Department. From this date to the date of the mother's death, the Welfare Department paid one thousand and three hundred dollars towards support of said children. The mother also received aid from Mrs. Ridgeway and Eleanor Ridgeway. The father was notified on January 6, 1964, that his children were on A.D.C. . . . He also knew that the mother had been ill since 1960 and was still seriously ill in 1964. The father made only one payment . . . [$397.69] on February 10, 1964 to the . . . Welfare Department. During the nine months that the children were on A.D.C. the father was earning . . .

[$1,060] per month. The father did not support the said children for fourteen months. On many birthdays the father only sent the children cards and no presents although he was employed as indicated above. The father evidenced no interest in these children from 1960 to the date of the filing of this petition, even though he had visitation rights. The moving of the children from a home with love and affection would be very detrimental to them. The father has shown no natural affection for these children.''

The findings that the father indicated no interest in the children from and after 1960 and that he has shown no natural affection for them are not justified on the evidence. His interest in them is attested currently by his contest of the grandmother's petition for guardianship. His earlier interest and concern is shown by his attempts in 1962 and 1963 to have them with him. His conduct thus tends to corroborate his testimony that he wants the children with him, that he loves them and is prepared to be a good father to them.

The mother's refusal to let the children leave Massachusetts in 1962 was on the advice of counsel and was understandable. From Cels's point of view, however, it was not unreasonable to wish to take the children for a visit to Ohio. It does not appear that he had in mind other than a visit such as the divorce decree permitted. There is no basis for assuming that the father's efforts to see his children were for other reason than natural affection for them. He supported them voluntarily from 1960 to 1962 and thereafter under his agreement and the divorce decree until the misadventure in July, 1963. The withholding of support thereafter was on the advice of counsel. It is to be judged as a desperate measure and though it risked hardship and embarrassment for his former wife and possible hardship for the children, it does not we think, in the light of the other evidence, support a conclusion that the father had no affection for or interest in them. Cels testified that he was prepared to repay the welfare department all sums paid by it for his children. We assume that he has done this or, if not, that he will promptly do so.

The record does not permit and there is no need for a determination of the cause of, or responsibility for, the separation of the children's parents and the hostility of the mother and grandmother to Cels. We assume that the mother's serious and finally fatal illness was at least a contributing cause and that Cels may have been at fault. That is beside the point, but Cels's failure to press for more visits must be judged in the light of the difficulties that arose when he attempted to see the children. He could of course have applied to the Probate Court, and thus enforced his rights. We think his failure to do so does not show unconcern about them. The distance separating the father and his children was such that casual visits were out of the question. Calls made in a hostile home for brief periods are obviously unsatisfactory, and the circumstances of such calls may frustrate the purpose of establishing or continuing a natural affectionate relationship.

The testimony as to gifts from Cels to his children was conflicting. Mrs. Ridgeway minimized them. Cels testified that he sent "numerous gifts . . . picture books, stuffed toys, cut-out toys; and . . . always . . . a birthday card and Christmas card." We think no conclusion against Cels can be drawn from the testimony as to gifts.

There is no finding that the father is unfit to have custody. The evidence does not permit such a conclusion. *Richards* v. *Forrest,* 278 Mass. 547, 552–553. His common law rights and obligations revived upon the death of the mother, and as he is not unfit to have custody the only issue is whether the best interests of the children require that he not have custody. *Barry* v. *Sparks,* 306 Mass. 80, 83–84.

It is, of course, speculative how the children will adjust to a new home with three strangers and a father who is almost a stranger. But a long range consideration of the childrens' welfare (*Jenkins* v. *Jenkins,* 304 Mass. 248, 250) points to placing them with their own parent in a home that will afford the guidance of both a father and a mother. Grandparents at best cannot take the place of parents of appropriate age, and masculine influence may be important.

*Merrill* v. *Berlin,* 316 Mass. 87, 89. It is desirable that the children join the family before reaching adolescence so that the readjustment of ties of affection will not be too severe. *Richards* v. *Forrest,* 278 Mass. 547, 555–556. *Gordon* v. *Gordon,* 317 Mass. 471. *Stinson* v. *Meegan,* 318 Mass. 459. The age of the grandmother suggests that the present home in Lexington cannot be counted on to continue through the years of adolescence and higher education. See the *Gordon* case, *supra,* 317 Mass. at 477.

We conclude that the father as the surviving parent is entitled to the custody of his minor children. We have every confidence that the courts of Ohio will take fully appropriate action to assure the welfare of the children, in the unlikely event that an occasion for court supervision should arise.

This is the opinion of a majority of the court.

The decree is reversed and the petition is to be dismissed.

*So ordered.*